Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
Christopher F. Jeu (SBN 247865)
Christian S. Ruano (SBN 352012)
Lauren Devens (SBN 364511)
**COTCHETT, PITRE & MCCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Phone: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cjeu@cpmlegal.com
ldevens@cpmlegal.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRADLEY SAMUELSON, individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br><br>THE MOSAIC COMPANY;<br>MOSAIC FERTILIZER, LLC;<br>NUTRIEN LTD.;<br>NUTRIEN AG SOLUTIONS, INC.;<br>CF INDUSTRIES HOLDINGS, INC.;<br>CF INDUSTRIES, INC.;<br>CF INDUSTRIES NITROGEN, LLC;<br>KOCH INDUSTRIES, LLC;<br>KOCH AGRONOMIC SERVICES, LLC;<br>KOCH AG & ENERGY SOLUTIONS, LLC;<br>KOCH FERTILIZER, LLC;<br>KOCH FERTILIZER WEVER, LLC;<br>YARA INTERNATIONAL ASA;<br>YARA NORTH AMERICA, INC.;<br>CANPOTEX LTD.;<br>INTERNATIONAL FERTILIZER ASSOCIATION; and<br>THE FERTILIZER INSTITUTE,<br><br>Defendants. | Civil Action No.:<br><br>CLASS ACTION COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page No.**


I. INTRODUCTION ..... 1

II. PARTIES ..... 2

A. Plaintiff ..... 2

B. Defendants ..... 3

1. Nutrien Defendants ..... 3
2. Mosaic Defendants ..... 3
3. CF Defendants ..... 4
4. Koch Defendants ..... 4
5. Yara Defendants ..... 5
6. Canpotex ..... 5
7. International Fertilizer Association Defendant; The Fertilizer Institute Defendant ..... 5

C. Co-Conspirators ..... 6

III. JURISDICTION AND VENUE ..... 6

IV. FACTUAL ALLEGATIONS ..... 7

A. The NPK Fertilizer Industry and Its Products ..... 7

1. Nitrogen Fertilizers ..... 8
2. Phosphorus Fertilizers ..... 8
3. Potassium (Potash) Fertilizers ..... 9

B. The Structure and Evolution of the NPK Fertilizer Market ..... 10

1. Industry Consolidation Transformed a Fragmented Market into an Oligopoly ..... 10
2. Consolidation Resulted in Dominance by a Small Group of Firms Across All NPK Segments ..... 12

C. Characteristics of the NPK Fertilizer Market that Facilitate Coordination ..... 12

1. Inelastic Demand ..... 13
2. Commodity Nature and Product Homogeneity ..... 13
3. Market Transparency and Information Availability ..... 14
4. Repeated Interactions Among a Small Group of Firms ..... 15

D. High Barriers to Entry Prevent New Competition ..... 16

E. NPK Fertilizer Prices Increased Dramatically and Diverged from Competitive Benchmarks ..... 17

F. The NPK Fertilizer Market Exhibits Multiple Indicia of Collusion ........................ 21

1. Defendants Exchange Competitively Sensitive Information Through Industry Organizations ........................ 21
2. Defendants Had a Strong Motive and Opportunity to Collude ........................ 22
3. Defendants' Conduct Is Consistent with Coordination and Inconsistent with Competition ........................ 23

G. Defendants' Conspiracy to Fix, Raise, and Maintain Prices of NPK Fertilizers ..... 23

H. Government Investigations and Public Scrutiny of the NPK Fertilizer Industry .... 24

V. STATUTE OF LIMITATIONS AND TOLLING ........................ 25

VI. CLASS ACTION ALLEGATIONS ........................ 26

A. Numerosity ........................ 26

B. Commonality ........................ 27

C. Typicality ........................ 27

D. Adequacy ........................ 27

E. Predominance and Superiority ........................ 27

VII. CLAIMS FOR RELIEF ........................ 28

VIII. PRAYER FOR RELIEF ........................ 30

IX. JURY DEMAND ........................ 30

Plaintiff brings this antitrust class action on behalf of itself and all others similarly situated against The Mosaic Company and Mosaic Fertilizer, LLC (together, "Mosaic"); Nutrien Ltd. and Nutrien Ag Solutions, Inc. (together, "Nutrien"); CF Industries Holdings, Inc., CF Industries, Inc., and CF Industries Nitrogen, LLC (together, "CF Industries"); Koch Industries, LLC, Koch Ag & Energy Solutions, LLC, Koch Fertilizer, LLC, Koch Fertilizer Wever, LLC, and Koch Agronomic Services, LLC (together, "Koch"); Yara International ASA and Yara North America, Inc. (together, "Yara"); and Canpotex Ltd. ("Canpotex"); International Fertilizer Association ("IFA"); and The Fertilizer Institute ("TFI") (collectively, "Defendants"). As alleged herein, Defendants conspired to fix, raise, maintain, and stabilize prices and restrict output of nitrogen, phosphorus, and potassium fertilizers ("NPK Fertilizers") sold throughout the United States, causing Plaintiff and members of the Class to pay supracompetitive prices.

## I. INTRODUCTION

1. Defendants are among the largest producers and distributors of NPK Fertilizers in the United States. Defendants CF Industries, Nutrien, Koch, and Yara (together, "Nitrogen Defendants") produce and sell nitrogen fertilizers; Defendants Nutrien and Mosaic (together, "Phosphorus Defendants") produce and sell phosphorus fertilizers; and Defendants Nutrien, Mosaic, and Canpotex (together, "Potash Defendants") produce, market, or distribute potassium-based fertilizers, commonly known as potash. Collectively, Defendants dominate a highly concentrated market for NPK Fertilizers in the United States.

2. Beginning no later than 2021, Defendants entered into and participated in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize prices and to restrict output of NPK Fertilizers sold throughout the United States. Through coordinated conduct across these product markets, Defendants aligned pricing and supply decisions and eliminated meaningful competition. These coordinated actions spanned multiple fertilizer products and producers and were implemented in parallel, reflecting agreement rather than independent conduct.

3. The NPK Fertilizer market is particularly susceptible to collusion. It is characterized by high concentration, significant barriers to entry, inelastic demand, and homogenous products. These structural features, combined with Defendants' dominance and repeated interactions across

product markets, created ideal conditions for coordination and facilitated Defendants' unlawful agreement.

4. Beginning in or around 2021, prices for NPK Fertilizers departed sharply from historical trends and increased at unprecedented rates. Prices spiked dramatically throughout 2021 and 2022 and remained elevated even after the supply disruptions Defendants cited as justification subsided. These sustained, supracompetitive prices were not the result of competitive market forces but rather the product of Defendants' coordinated conduct.

5. As a result of Defendants' conspiracy, Plaintiff and members of the Class paid significantly higher prices for NPK Fertilizers than they would have paid in a competitive market. These overcharges imposed substantial costs on U.S. farmers, who depend on NPK Fertilizers as essential inputs for agricultural production.

6. Defendants' conduct has generated extraordinary profits while insulating them from competitive pressures. Even as input costs declined and agricultural market conditions shifted, Defendants maintained elevated prices, demonstrating the artificial and coordinated nature of the pricing regime.

7. Public reporting and government scrutiny further support the existence of Defendants' unlawful conduct. In March 2026, public reporting indicates that the United States Department of Justice has opened an investigation into potential collusion among major fertilizer producers, including several Defendants, relating to the pricing of NPK Fertilizers.

8. Through the unlawful conduct alleged herein, Defendants have restrained trade in violation of Section 1 of the Sherman Act and the laws of unjust enrichment, causing Plaintiff and the Class to pay supracompetitive prices for NPK Fertilizers. Plaintiff brings this action to recover damages, obtain injunctive relief, and restore competition to the market.

## II. PARTIES

### A. Plaintiff

9. Plaintiff Bradley Samuelson is an individual who operates a farm in Coupland, Texas. During the Class Period, Plaintiff purchased one or more NPK Fertilizers directly from one or more

Defendants in the United States and paid supracompetitive prices as a result of Defendants' unlawful conduct. Plaintiff suffered antitrust injury of the type the antitrust laws were designed to prevent.

**B. Defendants**

**1. Nutrien Defendants**

10. Defendant Nutrien Ltd. is a publicly traded Canadian company headquartered in Saskatoon, Saskatchewan. Nutrien is the world's largest potash producer and one of the largest fertilizer companies globally, with substantial operations across nitrogen, phosphorus, and potassium fertilizers.

11. Nutrien was formed through the merger of Potash Corporation of Saskatchewan and Agrium Inc., creating a dominant fertilizer producer with significant control over North American production capacity. Following the merger, Nutrien controlled a substantial share of potash production capacity in North America.

12. Defendant Nutrien Ag Solutions, Inc. is a wholly owned subsidiary of Nutrien Ltd., incorporated in Delaware with its principal place of business in Loveland, Colorado. Nutrien Ag Solutions is one of the largest agricultural retail distributors in the United States and serves as a key distribution channel for Nutrien's fertilizer products.

13. During the Class Period, Nutrien manufactured, marketed, distributed, and sold nitrogen, phosphorus, and potash fertilizers throughout the United States and derived substantial revenues from those sales.

**2. Mosaic Defendants**

14. Defendant The Mosaic Company is a publicly traded company headquartered in Tampa, Florida. Mosaic is one of the largest producers of phosphate and potash fertilizers in North America.

15. Mosaic was formed through a merger between IMC Global Inc. and Cargill's crop nutrition business and later expanded through acquisitions, including the acquisition of Vale S.A.'s fertilizer business, increasing its production capacity and global reach.

16. Defendant Mosaic Fertilizer, LLC is a wholly owned subsidiary of Mosaic, incorporated in Delaware with its principal place of business in Minnetonka, Minnesota, and is engaged in fertilizer production.

17. During the Class Period, Mosaic manufactured, marketed, distributed, and sold phosphate fertilizers and potash throughout the United States and derived substantial revenues from those sales.

**3. CF Defendants**

18. Defendant CF Industries Holdings, Inc. is a publicly traded company incorporated in Delaware with its principal place of business in Northbrook, Illinois. CF Industries is the world's largest producer of ammonia, a key input in nitrogen fertilizers.

19. Defendant CF Industries, Inc. is a wholly owned subsidiary of CF Industries Holdings, Inc. and serves as its primary operating entity.

20. Defendant CF Industries Nitrogen, LLC is a subsidiary of CF Industries Holdings, Inc. and is engaged in nitrogen fertilizer production.

21. During the Class Period, CF Industries manufactured, marketed, distributed, and sold nitrogen fertilizers throughout the United States and derived substantial revenues from those sales.

**4. Koch Defendants**

22. Defendant Koch Industries, LLC is a privately held company headquartered in Wichita, Kansas and one of the largest privately held companies in the United States.

23. Defendant Koch Ag & Energy Solutions, LLC oversees Koch's fertilizer and energy operations and has invested heavily in fertilizer production infrastructure in North America.

24. Defendant Koch Fertilizer Wever, LLC operates a large nitrogen fertilizer production facility in Wever, Iowa, which became part of Koch's operations through a multi-billion-dollar acquisition completed in or around 2024.

25. Defendants Koch Fertilizer, LLC and Koch Agronomic Services, LLC are subsidiaries engaged in the production, marketing, and distribution of fertilizer products and related services.

26. During the Class Period, Koch manufactured, marketed, distributed, and sold nitrogen fertilizers throughout the United States and derived substantial revenues from those sales.

**5. Yara Defendants**

27. Defendant Yara International ASA is a publicly traded Norwegian company headquartered in Oslo, Norway and one of the largest global producers of nitrogen fertilizers.

28. Defendant Yara North America, Inc. is a wholly owned subsidiary of Yara International ASA, incorporated in Delaware with its principal place of business in Tampa, Florida.

29. During the Class Period, Yara manufactured, marketed, distributed, and sold nitrogen fertilizers throughout the United States and derived substantial revenues from those sales.

**6. Canpotex**

30. Defendant Canpotex Ltd. is a Canadian joint venture owned by Nutrien and Mosaic and headquartered in Saskatoon, Saskatchewan.

31. Canpotex coordinates the export marketing, sales, and transportation of potash produced by its owners through an integrated logistics and distribution system, including rail, port, and ocean transport infrastructure.

32. Through its role as a joint marketing and distribution entity, Canpotex facilitates coordination of potash supply, including production, inventory, and shipment decisions, among its owners.

**7. International Fertilizer Association Defendant; The Fertilizer Institute Defendant**

33. Defendant International Fertilizer Association ("IFA") is a global fertilizer trade association headquartered in Paris, France, whose membership includes many of the Defendant producers.

34. Defendant The Fertilizer Institute ("TFI") is a U.S.-based trade association headquartered in Arlington, Virginia that represents fertilizer manufacturers and provides industry data and market intelligence.

35. IFA and TFI provide forums and mechanisms through which Defendants exchange competitively sensitive information, including pricing, production, and market data, thereby facilitating coordination among competitors.

**C. Co-Conspirators**

36. Various other persons and entities, not named as Defendants, participated as co-conspirators in the unlawful conduct alleged herein and performed acts in furtherance of the conspiracy. These co-conspirators include additional fertilizer producers, distributors, and industry participants involved in the manufacture, marketing, and sale of NPK Fertilizers.

37. Upon information and belief, Defendants and their co-conspirators exchanged competitively sensitive information—including pricing, production, capacity, and demand data—and coordinated their conduct through industry associations, joint ventures, and other collaborative mechanisms.

38. Defendants are jointly and severally liable for the acts of their co-conspirators taken in furtherance of the conspiracy.

39. Whenever reference is made to any act of any corporation, the allegation means that the corporation acted through its officers, directors, employees, agents, or representatives acting within the scope of their authority.

40. Defendants are also liable for the acts of their subsidiaries, affiliates, predecessors, and successors during the Class Period.

## III. JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), because this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court also has jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

42. This Court has personal jurisdiction over Defendants because they transacted business throughout the United States, including in this District, and have purposefully directed their activities at this District. Defendants have sold NPK Fertilizers in a continuous and uninterrupted flow of interstate commerce, including in this District, and have derived substantial revenue from those sales.

43. Defendants' conduct, as alleged herein, was directed at and had a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendants' activities substantially affected interstate trade and commerce throughout the United States, including in this District.

44. Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c), because one or more Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of the affected interstate commerce described herein occurred in this District.

45. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class consists of more than 100 members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the Class is a citizen of a state different from at least one Defendant.

## IV. FACTUAL ALLEGATIONS

### A. The NPK Fertilizer Industry and Its Products

46. Fertilizer is a critical input in modern agriculture. It supplies essential nutrients that enable crops to grow, improve yields, and maintain soil health. Without sufficient fertilizer application, crop output declines significantly, directly affecting farm productivity and revenues.

47. The three primary nutrients required for nearly all crop production are nitrogen (N), phosphorus (P), and potassium (K), commonly referred to as "NPK." Fertilizers containing these nutrients—whether applied individually or in blended formulations—are essential to large-scale commercial farming operations.

48. Farmers must apply NPK Fertilizers during each growing season to maintain crop yields. Because fertilizer cannot be easily substituted or deferred without risking reduced output, demand for NPK Fertilizers is relatively inelastic.

49. NPK Fertilizers are commodity products with limited differentiation within each category. Nitrogen, phosphorus, and potassium fertilizers are standardized and largely interchangeable, and pricing is typically driven by market conditions rather than product-specific characteristics.

50. The production of NPK Fertilizers requires specialized industrial processes, access to key natural resources, and significant capital investment. Each category of fertilizer is produced through distinct methods involving different inputs, infrastructure, and geographic constraints, which contribute to the structure and concentration of the market.

**1. Nitrogen Fertilizers**

51. Nitrogen fertilizers are produced through industrial processes that convert atmospheric nitrogen into forms usable by plants, most commonly through the Haber-Bosch process. This process combines nitrogen from the air with hydrogen—typically derived from natural gas—under high temperature and pressure to produce ammonia.

52. Ammonia is the foundational input for nearly all nitrogen fertilizers. It may be applied directly in the form of anhydrous ammonia or further processed into other widely used nitrogen fertilizer products, including urea, ammonium nitrate, and urea-ammonium nitrate ("UAN") solutions.

53. Anhydrous ammonia is a pressurized liquid that is injected directly into soil and contains a high concentration of nitrogen. Urea, by contrast, is produced by combining ammonia with carbon dioxide and is typically sold as solid granules that can be stored, transported, and applied across a range of agricultural operations.

54. Nitrogen fertilizer production is highly energy-intensive and depends heavily on access to natural gas, which serves as both a feedstock and a fuel source. The construction and operation of ammonia production facilities require substantial capital investment, specialized engineering, and large-scale industrial infrastructure.

55. As a result of these characteristics, nitrogen fertilizer production is concentrated among a small number of large producers with the resources and infrastructure necessary to operate ammonia plants and related facilities.

**2. Phosphorus Fertilizers**

56. Phosphorus fertilizers are produced from phosphate rock, a naturally occurring mineral formed over millions of years from the accumulation of organic material in ancient seabeds.

57. Phosphate rock must be mined and processed before it can be used in fertilizer production. After extraction, the rock is treated with acid—typically sulfuric acid—to produce phosphoric acid, which is then used to manufacture finished fertilizer products such as monoammonium phosphate ("MAP") and diammonium phosphate ("DAP").

58. Phosphate mining and processing require substantial capital investment, specialized equipment, and extensive infrastructure, including mining operations, chemical processing facilities, and transportation networks.

59. Phosphate rock deposits are geographically concentrated, with significant reserves located in limited regions, including parts of the United States such as Florida and North Carolina.

60. The development of new phosphate mining operations involves significant regulatory and permitting requirements, including environmental review and land-use approvals, which can take years to complete.

61. As a result of these constraints, phosphorus fertilizer production is concentrated among a small number of large producers that control access to phosphate reserves and possess the infrastructure necessary to mine and process phosphate rock.

**3. Potassium (Potash) Fertilizers**

62. Potassium fertilizers, commonly referred to as potash, are produced from naturally occurring potassium salt deposits formed millions of years ago through the evaporation of ancient seas and lakes.

63. Potash is typically mined from underground deposits using either conventional underground mining or solution mining techniques. In conventional mining, shafts are drilled deep below the surface to access potash ore bodies, which are then extracted and processed. In solution mining, water is injected into underground deposits to dissolve potassium salts, and the resulting solution is brought to the surface for processing.

64. After extraction, potash is processed into fertilizer products, most commonly potassium chloride (also known as muriate of potash), and formed into uniform granules for agricultural use.

65. Potash production requires substantial capital investment, specialized mining infrastructure, and long development timelines. The construction and operation of potash mines involve significant engineering, environmental permitting, and logistical coordination.

66. The vast majority of potash used in the United States is imported, primarily from large-scale mining operations located in Canada. Domestic production is limited and accounts for only a small fraction of total U.S. supply.

67. As a result, potash production and supply are highly concentrated among a small number of large producers that control access to major reserves and the infrastructure required to extract and distribute potash at scale.

## B. The Structure and Evolution of the NPK Fertilizer Market

68. Over the past several decades, the structure of the NPK Fertilizer market has undergone a profound transformation. What was once a relatively fragmented industry composed of numerous competing producers has become highly consolidated, with production, reserves, and distribution increasingly controlled by a small group of firms. This evolution did not occur organically, but rather through a sustained pattern of mergers, acquisitions, and strategic integration that reshaped the competitive landscape. As a result, the modern NPK Fertilizer market is defined by concentration, interdependence among dominant producers, and structural conditions that facilitate coordinated behavior.

### 1. Industry Consolidation Transformed a Fragmented Market into an Oligopoly

69. As recently as the late twentieth century, the NPK Fertilizer industry in North America was characterized by a relatively fragmented competitive landscape, with numerous producers participating across nitrogen, phosphorus, and potash markets. Over time, however, a series of mergers, acquisitions, and consolidations fundamentally reshaped the industry. These transactions reduced the number of independent producers and concentrated production among a small group of dominant firms.

70. Through this consolidation, Defendants and their predecessors acquired key competitors, production facilities, and reserves, allowing them to expand capacity while eliminating

rival sources of supply. For example, Mosaic was formed through the combination of major fertilizer operations and later expanded through acquisitions that increased its control over phosphate and potash production.[1] Similarly, Nutrien emerged from the merger of PotashCorp and Agrium, combining one of the world's largest potash producers with a major agricultural input supplier and further consolidating production and distribution capabilities.[2] Other Defendants, including CF Industries[3], Koch[4], and Yara[5], likewise expanded their market positions through acquisitions, capacity expansions, and strategic investments that increased concentration within nitrogen fertilizer markets.

71. As a result of this sustained consolidation, the number of meaningful competitors in each of the nitrogen, phosphorus, and potash markets declined dramatically—from dozens of producers decades ago to only a handful of significant firms today. This consolidation did not merely reduce the number of firms; it fundamentally altered the structure of the market by concentrating production, reserves, and infrastructure in the hands of a small, interconnected group of companies.

72. The resulting oligopolistic structure has made coordination among producers more feasible. With fewer competitors, greater visibility into market conditions, and repeated interactions among the same firms, Defendants are better able to monitor one another's behavior, align output and pricing decisions, and sustain supracompetitive prices. This transformation from a fragmented market into a highly concentrated oligopoly is a critical structural feature that enables and facilitates Defendants' anticompetitive conduct.

---

[1] https://mosaicco.com/our-history ("Strategic acquisitions expanded our phosphate and fertilizer distribution businesses . . . ."; https://www.prnewswire.com/news-releases/the-mosaic-company-to-acquire-florida-phosphate-business-from-cf-industries-for-12-billion-229521141.html

[2] https://www.nutrien.com/news/press-releases/agrium-and-potashcorp-merger-completed-forming-nutrien-a-leader-in-global-agriculture-1551

[3] https://www.cfindustries.com/newsroom/2023/waggaman-acquisition-complete; https://www.cfindustries.com/newsroom/2016/port-neal-completion; https://cen.acs.org/business/mergers-&-acquisitions/CF-Industries-buying-Louisiana-ammonia/101/i10; https://financialpost.com/commodities/mining/fertilizer-maker-cf-industries-to-buy-oci-assets-for-us8b-creating-worlds-biggest-public-nitrogen-firm

[4] https://www.agriculturedive.com/news/koch-oci-fertilizer-plant-sale-wever-iowa/725901/; https://www.thedailyscoop.com/news/retail-industry/koch-ag-completes-acquisition-forms-joint-venture-moroccan-phosphate-subsidiary; https://www.okcommerce.gov/koch-fertilizer-to-invest-150m-in-enid-expansion/

[5] https://www.nytimes.com/2010/02/16/business/16bizbriefs-IOWAFERTILIZ_BRF.html

### 2. Consolidation Resulted in Dominance by a Small Group of Firms Across All NPK Segments

73. As a result of this consolidation, the NPK Fertilizer market is now dominated by a small group of firms that collectively control production across nitrogen, phosphorus, and potash fertilizers. The same core set of companies—Defendants Nutrien, Mosaic, CF Industries, Koch, and Yara—occupy leading positions across one or more segments of the market, with significant overlap in their operations and competitive interactions.

74. In nitrogen fertilizers, production is concentrated among a handful of firms, including CF Industries, Nutrien, Koch, and Yara, which together account for the vast majority of domestic supply. In phosphorus and potash fertilizers, concentration is even more pronounced, with Nutrien and Mosaic controlling the overwhelming share of production and reserves. This dominance is reinforced by control over key inputs, mining operations, and processing infrastructure necessary to produce NPK Fertilizers.

75. The result is a market in which a small number of firms repeatedly interact across multiple product segments, geographic markets, and levels of the supply chain. These firms are not isolated competitors in discrete markets, but rather participants in a tightly interconnected industry structure in which the same companies encounter one another across nitrogen, phosphorus, and potash markets.

76. This overlap further enhances the ability of Defendants to coordinate their conduct. Because Defendants compete and interact across multiple product lines and markets, they are able to monitor one another's behavior more effectively, detect deviations from coordinated strategies, and align their output and pricing decisions across the broader NPK Fertilizer market. The dominance of this small group of firms across all NPK segments is a defining structural feature of the market and a key facilitator of Defendants' anticompetitive conduct.

### C. Characteristics of the NPK Fertilizer Market that Facilitate Coordination

77. The structure of the NPK Fertilizer market is reinforced by economic and industry characteristics that make coordination among producers more likely and more sustainable. These characteristics—including inelastic demand, product homogeneity, market transparency, and

repeated interactions among a small number of firms—reduce incentives to compete and increase the feasibility of coordinated conduct. Together, they create market conditions in which Defendants can more easily align pricing and output decisions and maintain supracompetitive prices.

**1. Inelastic Demand**

78. Demand for NPK Fertilizers is relatively inelastic because fertilizers are essential inputs for agricultural production.[6] Farmers must apply nitrogen, phosphorus, and potassium to maintain crop yields, and failure to do so can result in significantly reduced output and financial loss.[7]

79. Because fertilizer application is necessary for each growing season, farmers have limited ability to reduce consumption in response to price increases. Unlike discretionary goods, fertilizer purchases cannot be easily deferred or substituted without materially affecting agricultural productivity.

80. As a result, even substantial increases in fertilizer prices do not lead to corresponding reductions in demand. Farmers, including Plaintiff and members of the Class, are often forced to absorb higher costs rather than reduce fertilizer use.

81. This inelastic demand reduces competitive pressure on producers. In a market where buyers cannot meaningfully decrease consumption, producers face diminished incentives to lower prices to attract additional sales.

82. The combination of inelastic demand and high concentration enables producers to raise and maintain prices above competitive levels without losing significant volume, making coordinated pricing strategies more effective and sustainable.

**2. Commodity Nature and Product Homogeneity**

83. NPK Fertilizers are commodity products with limited differentiation within each category. Nitrogen, phosphorus, and potassium fertilizers are standardized products that are largely interchangeable across producers.

84. Within each nutrient category, fertilizers are defined by their chemical composition and nutrient content rather than brand or producer-specific characteristics. For example, products

[6] https://www.cropnutrition.com/resource-library/understanding-fertilizer-and-its-essential-role-in-high-yielding-crops/
[7] *Id.*

such as urea, UAN, MAP, DAP, and potassium chloride are produced to standardized specifications and perform substantially similar functions regardless of the manufacturer.

85. Because NPK Fertilizers are largely homogeneous, purchasers typically make buying decisions based primarily on price and availability rather than product differentiation. As a result, price competition would ordinarily be the primary means of competition among producers.

86. However, in a market characterized by high concentration and repeated interaction among a small number of producers, product homogeneity can facilitate coordination. When products are interchangeable, it is easier for competitors to align prices without concern that buyers will shift demand based on product differences.

87. The lack of meaningful product differentiation reduces incentives for producers to compete on quality or innovation and instead increases the effectiveness of coordinated pricing strategies.

**3. Market Transparency and Information Availability**

88. The NPK Fertilizer market is characterized by a high degree of transparency with respect to pricing, production, and market conditions. Industry participants routinely have access to information regarding prevailing prices, supply levels, and demand trends.

89. Fertilizer prices are widely reported through industry publications, market indices, and other publicly available sources, allowing producers to observe pricing movements across the market in near real time.

90. In addition, market participants closely track production levels, capacity utilization, inventory levels, and shipment volumes, which provide insight into competitors' output decisions and overall market supply.

91. This transparency reduces uncertainty regarding competitors' behavior and allows producers to anticipate and respond to changes in pricing and output across the market.

92. In a concentrated market with few participants, such transparency enables firms to monitor one another's conduct and detect deviations from coordinated pricing or output strategies.

93. As a result, the availability of pricing and market information facilitates coordinated conduct by making it easier for Defendants to align their behavior and maintain supracompetitive prices.

**4. Repeated Interactions Among a Small Group of Firms**

94. The NPK Fertilizer market is characterized by repeated interactions among a small group of dominant producers. As described above, consolidation has reduced the number of meaningful competitors, leaving a handful of firms—including Nutrien, Mosaic, CF Industries, Koch, and Yara—that regularly compete with and observe one another across nitrogen, phosphorus, and potash markets.

95. These Defendants do not operate in isolation within a single product segment. Rather, they interact repeatedly across multiple fertilizer markets and levels of the supply chain. For example, Nutrien and Mosaic compete in both phosphate and potash fertilizers, while Nutrien, CF Industries, Koch, and Yara compete in nitrogen fertilizers. In addition, several Defendants participate in both production and distribution, further increasing their visibility into market conditions and competitors' behavior.

96. Defendants' repeated interactions are reinforced through participation in shared industry forums, including trade associations such as IFA and TFI, as well as joint ventures and coordinated distribution arrangements. These overlapping relationships provide Defendants with regular opportunities to observe market trends, monitor competitors' pricing and output decisions, and assess adherence to coordinated strategies.

97. Because Defendants encounter one another frequently across product markets, geographic regions, and industry channels, they are able to develop expectations regarding each other's conduct and respond strategically to changes in pricing and output. This repeated contact reduces uncertainty and facilitates the alignment of competitive behavior.

98. In such a market, firms can more easily detect and punish deviations from coordinated conduct. A producer that attempts to undercut prices or expand output risks retaliation from competitors, including price matching, output adjustments, or other competitive responses across related fertilizer markets in which the same firms participate.

99. These repeated interactions increase the stability of coordinated conduct by reinforcing incentives for Defendants to adhere to aligned pricing and output strategies rather than compete aggressively. The small number of dominant firms, combined with their frequent and overlapping interactions, makes coordination more feasible and sustainable and further enables Defendants to maintain supracompetitive prices.

### D. High Barriers to Entry Prevent New Competition

100. The NPK Fertilizer market is characterized by substantial barriers to entry that prevent new competitors from entering or expanding in response to supracompetitive pricing. These barriers reinforce Defendants' market power and protect the existing market structure from competitive disruption.

101. Entry into the NPK Fertilizer market requires enormous capital investment in mining, production facilities, and supporting infrastructure. The development of new fertilizer production capacity requires billions of dollars in upfront costs, specialized engineering, and years of construction before production can begin.

102. In addition to capital requirements, new entrants face significant regulatory and permitting hurdles. Fertilizer production and mining operations are subject to extensive environmental and land-use regulations, which can delay or prevent the development of new facilities.

103. Access to key inputs and natural resources further limits entry. Potash and phosphate fertilizers depend on access to finite mineral reserves, which are geographically concentrated and often controlled by existing producers. Similarly, nitrogen fertilizer production requires reliable access to natural gas and established production infrastructure.

104. New entrants must also overcome logistical and distribution barriers. The production and transportation of fertilizers require specialized storage, rail, and shipping infrastructure, much of which is already controlled or heavily utilized by incumbent firms.

105. These barriers to entry prevent new competitors from entering the market at a scale sufficient to discipline prices or increase supply. Even in the face of sustained price increases and elevated profits, entry remains limited and slow.

106. As a result, Defendants are able to maintain and exercise market power without meaningful threat of new competition, further facilitating coordinated conduct and the maintenance of supracompetitive prices.

**E. NPK Fertilizer Prices Increased Dramatically and Diverged from Competitive Benchmarks**

107. Beginning sometime in 2020, and accelerating sharply through 2021 and 2022, prices for NPK Fertilizers in the United States increased dramatically, reaching historic highs. These price increases were widespread across nitrogen, phosphorus, and potash fertilizers and were sustained over a prolonged period.

**Figure 1. Producer Price Index for Fertilizers (Last 14 Years)**




**Figure 2. Producer Price Index for Nitrogen Fertilizers (Last 11 Years, Maximum Observation)**



**Figure 3. Producer Price Index for Phosphorus Fertilizers (Last 11 Years)**




**Figure 4. Producer Price Index for Potash (Last 11 Years)**




108. As displayed above, prices for fertilizer, particularly NPK Fertilizers, rose significantly during this period, with certain products more than doubling in price. The substantial upward movement of prices across all major NPK segments reflects a coordinated endeavor by Defendants to realize increased profits.

109. These price increases imposed significant financial burdens on U.S. farmers. Farmers were required to pay substantially more for essential inputs, leading to sharply increased production costs across a wide range of agricultural operations.

110. The magnitude and persistence of these price increases departed from historical pricing patterns in the fertilizer industry. Traditionally, fertilizer prices fluctuated in response to changes in input costs, supply conditions, and agricultural demand. However, during the Class

Period, prices remained elevated even after many of the conditions cited to justify increases had stabilized or reversed.

111. In particular, fertilizer prices remained high despite declines or stabilization in key input costs and improvements in supply chain conditions. This sustained elevation in prices is inconsistent with competitive market behavior.

112. At the same time, Defendants reported significant increases in revenues and profit margins, further indicating that elevated prices were not solely the result of increased production costs or external market forces. These elevated profits were achieved without corresponding increases in competitive output, further supporting the inference of coordinated conduct.

113. The uniform and sustained nature of these price increases across multiple product segments and producers is indicative of coordinated conduct rather than independent competitive behavior.

114. Defendants have attributed rising fertilizer prices during the Class Period to increases in input costs and global supply disruptions.[8] However, the magnitude and persistence of fertilizer price increases cannot fully be explained by these factors.[9]

115. For example, while natural gas is a primary input in the production of nitrogen fertilizers, fluctuations in natural gas prices do not fully account for the sustained increases in fertilizer prices observed during the Class Period. Although natural gas prices increased during certain periods, they later stabilized or declined while fertilizer prices remained elevated.

116. Similarly, Defendants have pointed to global supply chain disruptions and geopolitical events as justifications for price increases. But these conditions were temporary and did not persist at levels sufficient to explain the prolonged elevation of fertilizer prices.

---

[8] https://www.argusmedia.com/en/news-and-insights/latest-market-news/2282446-us-farm-group-asks-doj-to-investigate-fertilizer-prices

[9] Sarah Carden et al., BIG FERTILIZER: MEASURING THE IMPACTS OF FOOD AND FARM SYSTEM CONCENTRATION, A Special Report by Farm Action Prepared for the U.S. House of Representatives Judiciary Subcommittee on Antitrust, Commercial, and Administrative Law, at 2 ("We note that while cost of production has increased and supply-chain disruptions have been rampant, fertilizer corporations are raising their prices far beyond the necessary thresholds, enabling them to report record-breaking profits").

117. Historical pricing patterns in the fertilizer industry demonstrate that prices typically rise and fall in response to changes in input costs and market conditions. In contrast, during the Class Period, fertilizer prices increased rapidly and remained elevated even after underlying cost pressures subsided. See, supra, Figures 1-4.

118. At the same time, Defendants reported substantial increases in revenues and profit margins that far outpaced any corresponding increases in production costs. See, Figure 5. These outsized profits are inconsistent with a competitive market in which prices reflect underlying costs.




**Figure 5. Defendants Profits During the Class Period**

119. The divergence between fertilizer prices and underlying input costs indicates that factors other than competitive market forces were driving price increases. This disconnect is consistent with coordinated conduct among Defendants to raise and maintain prices at supracompetitive levels.

### F. The NPK Fertilizer Market Exhibits Multiple Indicia of Collusion

120. As described above, the NPK Fertilizer market is highly concentrated, characterized by inelastic demand, homogeneous products, and repeated interactions among a small number of dominant firms. These structural features create conditions conducive to coordination and reduce the incentives for independent price competition.

121. Consistent with these conditions, Defendants' conduct exhibits multiple indicia of collusion, including the exchange of competitively sensitive information, a shared motive and opportunity to coordinate, and pricing behavior that is inconsistent with competitive market dynamics.

#### 1. Defendants Exchange Competitively Sensitive Information Through Industry Organizations

122. Defendants regularly participate in industry organizations, including IFA and TFI, which facilitate the exchange of confidential, proprietary, and competitively sensitive information among market participants.

123. IFA "is the only global fertilizer association" whose membership includes producers, distributors, and other participants across the fertilizer value chain.[10] Defendants and their co-conspirators are members of IFA and participate in its meetings, conferences, and data-sharing initiatives.

124. Through IFA, members share information regarding production levels, capacity, inventories, pricing conditions, demand forecasts, and other competitively sensitive data. IFA provides platforms and forums through which this information can be exchanged among competitors.

125. Similarly, TFI is a U.S.-based trade association that "represent[s] every segment of the fertilizer supply chain" including "manufacturers, [] importers, distributors, wholesalers, and of course ag retail."[11] Defendants are members of TFI and participate in its activities, including conferences, committees, and data-sharing programs.

[10] https://www.fertilizer.org/about-ifa/what-we-do/
[11] https://www.tfi.org/membership/why-join-tfi/

126. TFI offers its members access to market intelligence, including data relating to sales volumes, pricing trends, and other industry metrics, which provide insight into competitors' business strategies and market behavior.

127. Participation in these organizations enables Defendants to exchange and access non-public, competitively sensitive information that would not be available in a competitive market.

128. The exchange of such information reduces uncertainty regarding competitors' actions and facilitates coordination by allowing Defendants to monitor one another's conduct, align pricing and output decisions, and detect deviations from coordinated strategies.

129. In addition to coordination through industry associations, Defendants also interact through joint ventures and shared marketing arrangements that further facilitate alignment of pricing and output decisions. For example, Defendant Canpotex Ltd. is a joint venture owned by Nutrien and Mosaic that coordinates the export marketing, sales, and transportation of potash. Through this structure, Defendants are able to align supply decisions, manage inventories, and coordinate shipments of potash products. Such joint coordination mechanisms provide additional opportunities for Defendants to exchange information and monitor market conditions, further facilitating coordinated conduct across the NPK Fertilizer market.

**2. Defendants Had a Strong Motive and Opportunity to Collude**

130. Defendants had a strong economic motive to coordinate their conduct. By limiting output and maintaining elevated prices, Defendants were able to generate substantial increases in revenues and profit margins during the Class Period.

131. The concentrated structure of the NPK Fertilizer market provided Defendants with the opportunity to coordinate. A small number of dominant firms control the majority of production across nitrogen, phosphorus, and potash fertilizers, enabling them to influence market-wide pricing and output.

132. Defendants' repeated interactions across multiple product markets and over time further facilitated coordination. Because Defendants regularly encounter one another in the marketplace, they are able to anticipate and respond to each other's conduct.

133. In addition, high barriers to entry prevent new competitors from entering the market or expanding output in response to elevated prices, reducing the risk that coordinated conduct will be undermined by competitive forces.

134. These conditions created both the incentive and the ability for Defendants to coordinate their pricing and output decisions and maintain supracompetitive prices.

#### 3. Defendants' Conduct Is Consistent with Coordination and Inconsistent with Competition

135. Defendants' pricing and output behavior during the Class Period is consistent with coordinated conduct and inconsistent with independent, competitive decision-making.

136. As described above, fertilizer prices increased sharply and in parallel across nitrogen, phosphorus, and potash products, and remained elevated over time despite changes in underlying cost conditions.

137. In a competitive market, producers would be expected to respond to changing input costs, demand conditions, and competitive pressures by adjusting prices and output independently. Instead, Defendants' conduct reflects sustained and uniform pricing behavior across the market.

138. The parallel and persistent nature of these price increases, combined with the structural characteristics of the market and Defendants' opportunities to exchange competitively sensitive information, supports the inference that Defendants' conduct was the result of agreement rather than independent action.

### G. Defendants' Conspiracy to Fix, Raise, and Maintain Prices of NPK Fertilizers

139. Beginning no later than 2021, Defendants entered into and participated in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize the prices of NPK Fertilizers sold in the United States at supracompetitive levels.

140. Defendants implemented this conspiracy by coordinating their pricing and output decisions. Rather than competing independently, Defendants acted in concert to restrict supply, avoid price competition, and maintain elevated price levels across nitrogen, phosphorus, and potash fertilizers. This coordination was further supported by joint ventures and shared distribution

mechanisms, including Canpotex, which enabled Defendants to align supply and pricing strategies across key fertilizer products.

141. Defendants' agreement was reached and carried out through a combination of direct and indirect communications, including through industry organizations such as IFA and TFI, as well as other channels that allowed Defendants to exchange information and align their conduct.

142. In furtherance of the conspiracy, Defendants monitored one another's pricing and output decisions and adjusted their own conduct to maintain coordinated market outcomes. This monitoring was facilitated by the transparency of the market and the exchange of competitively sensitive information.

143. Defendants' coordinated conduct included parallel price increases, output discipline, and the maintenance of elevated prices even after input costs and market conditions stabilized or declined.

144. Defendants' actions were interdependent and mutually reinforcing. Each Defendant understood that its ability to maintain supracompetitive prices depended on the continued participation of the other Defendants in the conspiracy.

145. As a result of this agreement, competition among Defendants was substantially restrained, and prices for NPK Fertilizers were artificially inflated above competitive levels.

**H. Government Investigations and Public Scrutiny of the NPK Fertilizer Industry**

146. Defendants' conduct and the structure of the NPK Fertilizer market have drawn increasing scrutiny from government agencies, lawmakers, and industry experts.

147. On March 4, 2026, Bloomberg reported that the United States Department of Justice, Antitrust Division, had opened an investigation into potential anticompetitive conduct in the fertilizer industry, including possible price-fixing and coordination among major NPK Fertilizer producers. The investigation reportedly includes several of the Defendants named in this Complaint.

148. In addition, members of Congress have raised concerns regarding consolidation and rising input costs in the agricultural sector. On October 28, 2025, the United States Senate Judiciary Committee held a hearing entitled "Pressure Cooker: Competition Issues in the Seed & Fertilizer

Industries," during which lawmakers, farmers, and industry experts discussed the impact of consolidation and reduced competition on fertilizer prices.[12]

149. During that hearing, participants identified consolidation among a small number of dominant fertilizer producers as a key driver of rising prices and reduced competition in the market.

150. Government officials have likewise expressed concern about the competitive dynamics of the fertilizer industry. In January 2026, a senior official from the United States Department of Agriculture warned that increasing concentration in agricultural input markets, including fertilizers, raises the risk of anticompetitive conduct and harm to farmers.[13]

151. These investigations and public statements reflect growing concern that the structure and behavior of the NPK Fertilizer market may be the result of unlawful coordination among dominant producers.

## V. STATUTE OF LIMITATIONS AND TOLLING

152. Plaintiff incorporates by reference each preceding paragraph as if fully set forth herein.

153. Plaintiff brings this action within four years of the accrual of its claims under Section 1 of the Sherman Act.

154. Defendants' unlawful conspiracy was self-concealing and carried out in a manner designed to avoid detection. Defendants engaged in secret communications, indirect coordination, and other conduct intended to conceal the existence of the conspiracy.

155. Defendants also misled purchasers and the public by attributing price increases to legitimate market forces—such as supply chain disruptions, input cost increases, and global market volatility—thereby obscuring the true cause of rising fertilizer prices.

156. Plaintiff and members of the Class had no knowledge of the conspiracy and could not reasonably have discovered it through the exercise of due diligence. Defendants possessed superior, non-public information regarding pricing, production, and supply decisions in an opaque market.

[12] https://www.judiciary.senate.gov/committee-activity/hearings/pressure-cooker-competition-issues-in-the-seed-and-fertilizer-industries

[13] https://www.farms.com/ag-industry-news/usda-raises-concerns-over-fertilizer-market-competition-903.aspx

157. Plaintiff and members of the Class did not discover, and could not reasonably have discovered, Defendants' unlawful conduct until shortly before the filing of this action, including through recent public reporting and government investigation into potential collusion in the fertilizer industry.

158. Accordingly, the statute of limitations applicable to Plaintiff's claims has been tolled by Defendants' fraudulent concealment.

159. Defendants' conspiracy also constitutes a continuing violation of the antitrust laws. Each sale of NPK Fertilizers at supracompetitive prices during the Class Period constitutes a new overt act that caused injury to Plaintiff and members of the Class.

160. Plaintiff and members of the Class are entitled to recover damages for all injuries suffered during the applicable limitations period, including those occurring within four years of the filing of this action.

## VI. CLASS ACTION ALLEGATIONS

161. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and the following Class:

> All persons and entities in the United States and its territories who purchased NPK Fertilizers directly from one or more Defendants during the Class Period (the "Class").

162. Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities. Also excluded are any judges or justices involved in this action and any members of their immediate families.

163. The Class Period begins no later than January 1, 2021 and continues through the present, or such later date as the Court may determine.

### A. Numerosity

164. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time, Plaintiff believes that there are thousands of Class members dispersed throughout the United States.

**B. Commonality**

165. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members. These common questions include, but are not limited to:

a. Whether Defendants engaged in the alleged contract, combination, or conspiracy;
b. The identity of the participants in the alleged conspiracy;
c. The duration and scope of the conspiracy;
d. Whether Defendants' conduct violated Section 1 of the Sherman Act and unjust enrichment laws;
e. Whether Defendants' conduct caused antitrust injury to Plaintiff and the Class;
f. The appropriate measure of damages and the amount of overcharges, if any;
g. Whether Defendants' conduct should be enjoined.

**C. Typicality**

166. Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class members were similarly affected by Defendants' unlawful conduct. Plaintiff, like all Class members, purchased NPK Fertilizers at artificially inflated prices as a result of Defendants' conspiracy.

**D. Adequacy**

167. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class and has retained counsel competent and experienced in antitrust and class action litigation.

168. There are no conflicts between Plaintiff and the Class that would prevent Plaintiff from adequately representing the Class.

**E. Predominance and Superiority**

169. Questions of law and fact common to the Class predominate over any questions affecting only individual members.

170. Defendants' conduct as alleged herein affected all Class members in a similar manner, and Plaintiff's antitrust claims are capable of proof through common evidence, including evidence relating to Defendants' pricing, production, and market conduct.

171. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual actions would be impracticable given the cost of litigation relative to the size of individual claims.

172. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort.

173. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for Defendants.

## VII. CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### (Against All Defendants)

174. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

175. Beginning no later than 2021 and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

176. The conspiracy consisted of an agreement among Defendants to fix, raise, maintain, or stabilize the prices of NPK Fertilizers sold in the United States and to coordinate output and supply.

177. In furtherance of the conspiracy, Defendants:

a. raised, fixed, maintained, or stabilized prices of NPK Fertilizers;
b. restricted output and supply;
c. exchanged competitively sensitive information; and
d. monitored and enforced adherence to coordinated pricing and output strategies.

178. Defendants' conduct had the following effects, among others:

a. competition among Defendants has been restrained, suppressed, or eliminated in the market for NPK Fertilizers;
b. prices for NPK Fertilizers have been fixed, raised, maintained, or stabilized at artificially high levels; and
c. Plaintiff and members of the Class have been deprived of the benefits of free and open competition.

179. Defendants' conduct constitutes a per se violation of Section 1 of the Sherman Act. Defendants' conduct is also unlawful under the rule of reason because the agreement is anticompetitive and lacks any legitimate procompetitive justification. Any purported justifications could have been achieved through less restrictive means.

180. Defendants' conspiracy had a substantial and direct effect on interstate commerce in the United States.

181. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business or property by paying supracompetitive prices for NPK Fertilizers.

182. Plaintiff and members of the Class are entitled to recover treble damages, costs of suit, and reasonable attorneys' fees pursuant to 15 U.S.C. § 15.

183. Plaintiff and members of the Class are also entitled to injunctive relief pursuant to 15 U.S.C. § 26.

**COUNT II**
**Unjust Enrichment**
**(In the Alternative, Against All Defendants)**

184. Plaintiff incorporates by reference the allegations set forth above as if fully set forth herein.

185. In the alternative to its antitrust claims, Plaintiff brings this claim for unjust enrichment.

186. Through the unlawful conduct described herein, Defendants have received and retained benefits at the expense of Plaintiff and members of the Class.

187. Defendants have unjustly obtained revenues and profits by charging artificially inflated prices for NPK Fertilizers as a result of their anticompetitive conduct.

188. Plaintiff and members of the Class conferred a benefit upon Defendants by purchasing NPK Fertilizers at supracompetitive prices.

189. Defendants knowingly accepted and retained these benefits under circumstances that make it inequitable for them to retain those benefits without paying restitution.

190. The retention of these ill-gotten gains violates fundamental principles of justice, equity, and good conscience.

191. Plaintiff and members of the Class are entitled to restitution, disgorgement, and other appropriate equitable relief to remedy Defendants' unjust enrichment.

## VIII. PRAYER FOR RELIEF

192. Plaintiff, on behalf of itself and the Class, respectfully requests relief as follows:

a. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

b. Adjudge and decree that Defendants' conduct constitutes an unlawful contract, combination, or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and unjust enrichment laws;

c. Enter an order permanently enjoining and restraining Defendants and their officers, agents, employees, successors, and assigns from continuing the unlawful conduct alleged herein;

d. Award Plaintiff and members of the Class damages in an amount to be determined at trial, including treble damages as provided by law;

e. Award restitution and disgorgement of Defendants' ill-gotten gains;

f. Award Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses;

g. Award pre-judgment and post-judgment interest as permitted by law; and

h. Grant such other and further relief as the Court deems just and proper.

## IX. JURY DEMAND

193. Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 6, 2026

Respectfully submitted,

*/s/ Adam J. Zapala*
Adam J. Zapala (SBN 245748)
Elizabeth T. Castillo (SBN 280502)
Christopher F. Jeu (SBN 247865)
Christian S. Ruano (SBN 352012)
Lauren Devens (SBN 364511)
**COTCHETT, PITRE & McCARTHY LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
cjeu@cpmlegal.com
cruano@cpmlegal.com
ldevens@cpmlegal.com

***Counsel for Plaintiff and the Proposed Class***